IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

v.

STANLEY B. MCDUFFIE
(f/k/a STANLEY ROBERSON AND STANLEY BATTLE),
and
JILAPUHN, INC. (d/b/a HER MAJESTY'S CREDIT UNION),

                    Defendants.

---

## COMPLAINT

---

Plaintiff, United States Securities and Exchange Commission ("SEC"), states and alleges as follows against Defendants Stanley B. McDuffie (f/k/a Stanley Roberson and Stanley Battle) ("McDuffie") and Jilapuhn, Inc. (d/b/a Her Majesty's Credit Union) ("HMCU"):

### I.        SUMMARY OF THE ACTION

1.        This case involves a fraudulent and unregistered offering of purported certificates of deposit ("CDs") issued by HMCU, through which McDuffie and HMCU raised at least $532,000, and misappropriated nearly all of those funds.

2.        From 2008 through September 2012, McDuffie and HMCU used the website www.hmcu.net ("Website") to lure investors by offering HMCU CDs with above-market annual interest rates and by making misleading statements and omissions to portray HMCU as a genuine, secure credit union that was regulated and that held insurance covering investor deposits.  McDuffie and HMCU even falsely represented that HMCU was insured by Lloyd's of London.

3.     In reality, HMCU has never been a federally or state chartered credit union, has never been regulated as a credit union by any government authority, has never held insurance covering its investor deposits, and has never been insured by Lloyd's of London.  Instead, HMCU is the trade name of a for-profit corporation that is controlled by McDuffie.  Rather than loaning or investing CD deposits, as would be the case with a legitimate credit union, McDuffie and HMCU deposited investor funds into financial institution accounts held by HMCU, and then misappropriated the funds for personal and business expenses, causing investors to lose most of their principal, and rendering it impossible for HMCU to make required interest payments.

4.     By October 2011, HMCU became unable to make required interest payments to investors, and by December 2011, HMCU defaulted on its obligation to return one large investor's principal when his CD reached its maturity date.  From late 2011 until at least early 2012, McDuffie and HMCU made false and misleading statements to investors to try to lull them into complacency and to delay the disclosure of their fraudulent scheme.

## II.     SUMMARY OF THE VIOLATIONS

5.     As a result of the conduct described in the Complaint, McDuffie and HMCU offered and sold unregistered securities, obtained money or property on the basis of misleading statements and omissions, and made misleading statements and omissions.  Accordingly, McDuffie and HMCU have violated, and unless restrained and enjoined, will continue to violate Sections 5(a), 5(c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]; and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

6.     Also as a result of the conduct described in the Complaint, McDuffie and HMCU engaged in a scheme to defraud and have violated and, unless restrained and enjoined, will

continue to violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

7.      In the alternative, as a result of the conduct described herein, McDuffie is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t] for HMCU's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      The SEC seeks to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The Commission seeks permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus pre-judgment and post-judgment interest thereon, and third-tier civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## III.      JURISDICTION AND VENUE

9.      The Court has jurisdiction pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d) and (e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e) and 78aa].  In connection with the acts described in this Complaint, the Defendants have used the mails, the internet, other instruments of communication in interstate commerce, and means or instrumentalities of interstate commerce.

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b)(1) & (2). During the period of conduct alleged herein, Jilapuhn, Inc., which McDuffie has caused to be

incorporated in Georgia, Colorado and the U.S. Virgin Islands, maintained corporate offices in Denver or Watkins, Colorado.  McDuffie is a resident of Denver, Colorado.  Further, many of the acts and practices described in this Complaint occurred in the District of Colorado.

## IV.     DEFENDANTS

11.     **Stanley B. McDuffie (f/k/a Stanley Roberson and Stanley Battle)** is a resident of Denver, Colorado, and is the chief executive officer ("CEO") of HMCU.  As CEO, McDuffie exercised control over the management, general operations and policies of HMCU, including the specific activities upon which HMCU's violations are based.  After a subpoena enforcement action resulted in McDuffie being ordered by the Court to comply with the SEC's subpoenas, McDuffie refused to testify in the SEC's investigation, citing his Fifth Amendment privilege against self-incrimination in response to all substantive questions.

12.     **Jilapuhn, Inc. (d/b/a Her Majesty's Credit Union)** is a corporation that McDuffie caused to be separately incorporated in Colorado, Georgia, and the U.S. Virgin Islands.  In 2007, McDuffie registered the trade name "Her Majesty's Credit Union" for Jilapuhn, Inc. in the U.S. Virgin Islands.  He registered the same trade name in Colorado in 2008. HMCU has its corporate offices in Watkins, Colorado and McDuffie is its CEO.  The company has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.

## V.     FACTS

A.     **McDuffie's Credit Union History**

13.     McDuffie is the CEO of Jilapuhn, Inc., a for-profit corporation that he caused to be incorporated in Georgia in 1997, in Colorado in 2004, and in the U.S. Virgin Islands in 2005.

14.     In approximately January 2005, Jilapuhn, Inc. began operating a credit union called the Jilapuhn Employees Federal Credit Union ("JEFCU") in East Point, Georgia.  JEFCU was a federally-chartered credit union, meaning that it was supervised, regulated and insured by the National Credit Union Administration ("NCUA"), an independent federal agency that regulates, charters, and supervised federal credit unions.  McDuffie, as the CEO of Jilapuhn, Inc., was the organizer of JEFCU.

15.     In August 2005, after JEFCU had operated for only eight months, the NCUA determined that JEFCU was insolvent, and therefore it issued a Notice of Involuntary Liquidation and Revocation of Charter ("Notice of Liquidation").  The NCUA sought involuntary liquidation because, among other things, it had determined that JEFCU "had an impaired capital position and was experiencing irresolvable problems in the areas of capital adequacy, cash management, record keeping and management."

16.     JEFCU refused to cooperate with the NCUA liquidation, instead filing a complaint seeking a preliminary injunction in the United States District Court for the Northern District of Georgia, *Jilapuhn Employees Federal Credit Union v. NCUA*, 05-CV-2306-JEC (filed Sept. 2, 2005).  In that litigation, JEFCU's request for injunctive relief was denied and the NCUA's petition for enforcement of the Notice of Liquidation was granted.

17.     In 2007, in an apparent attempt to avoid the type of regulation and oversight that made his first credit union a short-lived venture, McDuffie, through Jilapuhn, Inc., opened HMCU, purportedly as a credit union based in the U.S. Virgin Islands.

18.     Between 2008 and 2011, HMCU obtained a basic license to do business in the U.S. Virgin Islands from the U.S. Virgin Islands Department of Licensing and Consumer Affairs ("DLCA").  HMCU's business license, which has now lapsed, was similar to registrations or

licenses typically granted by various states' secretaries of state.  Under the license provided by the DLCA, HMCU has not been subject to any of the rigorous examination and audit procedures applicable to federally and state chartered credit unions regarding, among other things:  capital adequacy; lending and investment policies; loan loss reserves; affiliated and related party transactions, or internal controls.

19.     HMCU has never been federally chartered by the NCUA, or chartered by any state, and thus is not subject to regulations applicable to federally or state chartered credit unions.

20.     From at least October 2008 to September 2012, HMCU operated through its Website.  HMCU also operated one physical branch location in the U.S. Virgin Islands and a corporate office in Colorado.

21.     Since at least 2008, McDuffie has controlled HMCU's business, including, but not limited to:  registering and controlling the content of HMCU's Website; offering and selling HMCU's purported CDs; communicating with HMCU investors; opening accounts at financial institutions in the name of HMCU; and depositing and withdrawing funds in those accounts.

**B.      McDuffie and HMCU Offered and Sold the HMCU CDs.**

22.     Between at least December 2008 and September 2012, McDuffie and HMCU used the Website to advertise and offer the purported CDs to the general public.  During portions of that time period, McDuffie and HMCU also advertised the HMCU CDs on the internet through advertisements on eBay and Google.

23.     The HMCU purported CDs offered above-market annual interest rates for certificates of deposit, offering rates ranging from 1.75% to 7.75% over the past several years.

24.    From at least December 2008 until September 2012, HMCU's Website included a message inviting prospective investors to "click" on a link to open a CD.  Specifically, in December 2008, the Website homepage stated:

> HIGH YIELD CD RATES UP TO 7.75% APR
> Click hear [sic] to open a CD
> You do not have to be a member to open a CD with HMCU

In September 2012, the Website homepage stated:

> Click Here to open a CD
> You do not have to be a member to open a CD with HMCU

25.    HMCU's Website was available to the general public, and some investors found the Website after conducting internet searches for high-interest-rate CDs.

26.    After clicking on the Website solicitation, prospective investors were linked to a short, online credit union membership and CD application.  After submitting the online application or otherwise inquiring about purchasing CDs, some investors had telephone conversations with an HMCU representative, believed to be McDuffie, accepting their application and instructing them to send funds to HMCU.

27.    After sending their funds to HMCU, investors received documents entitled "Certificates of Deposit and Disclosure Statement" and/or "Credit Union Share Certificate," which reflected, among other things, the amount they had invested, the maturity date of the CD, and the interest rate.

28.    From December 2008 to September 2012, HMCU raised at least $532,000 from at least four investors through its sales of purported CDs.

C.    **McDuffie and HMCU Made False, Fraudulent and Material Misrepresentations and Omissions in Connection with the Offer and Sale of the HMCU CDs**

i.    **HMCU's Structure, Governance and Regulation as a Credit Union**

29.    Generally speaking, credit unions are not-for-profit financial institutions that are owned and controlled by their members and governed by boards and committees, which are elected by members.  Funds held in credit union member accounts are the primary source of funds for credit unions, and most member funds are used to make loans to members, though credit unions may also make investments with members' funds.  Credit unions are subject to extensive regulation by either the NCUA or state regulators.  Because of their extensive regulation and provision of share insurance that mirrors bank deposit insurance provided by the Federal Deposit Insurance Corporation, credit unions are thought of as a safe alternative to banks.

30.    HMCU and McDuffie have falsely and fraudulently stated and implied that HMCU is structured, controlled, and regulated as a credit union by, among other things:

a.    From at least December 2008 to the present, repeatedly using the term "credit union" on HMCU's Website and in promotional materials;

b.    From at least December 2008 to the present, claiming on the Website, "[w]e have no stockholders—no outside third parties to exert influence.  Each member has one vote in annual elections regardless of the amount of money they have deposited in the credit union;"

c.    From at least December 2008 to the present, claiming on the Website that HMCU is "regulated by" the DLCA;

d.    From at least December 2008 to the present, displaying on the Website the trademarked logo of the Credit Union National Association ("CUNA"), a national

trade association serving credit unions, thereby implying that HMCU was associated with, or had obtained a license from, CUNA; and

e.  Stating in a promotional flyer that was distributed to prospective investors in the U.S. Virgin Islands in approximately November 2009, "[w]e're a safe haven in this economic storm, and we'll continue to stick to our values and remain strong. For a safe, secure place to put your money, look to the Credit Union."

31.     From at least December 2008 to the present, in all written information provided to investors and in oral conversations during the HMCU CD offering, HMCU and McDuffie have omitted the material information that HMCU was not structured, governed or regulated as a credit union.

32.     Each of the representations and omissions regarding HMCU's status as a credit union was false and misleading because:

a.  HMCU is not structured as a credit union.  HMCU is not member-owned, it does not have a charter, it does not have bylaws, it does not have an independent board of directors elected by the membership, it does not have credit, supervisory or audit committees, and McDuffie made all decisions regarding the use of investors' funds.

b.  HMCU has never been regulated as a credit union.  It is neither federally nor state chartered and it has never been audited or examined by any governmental authority.

c.  HMCU has never been regulated by the DLCA, or any other government entity in the U.S. Virgin Islands.  Counsel for the DLCA has publically stated "there are no rules and regulations" governing credit unions in the U.S. Virgin Islands, and the

Commissioner of the DLCA has publically stated that the DLCA has "not actively audited" HMCU.

d.  HMCU is not a member of CUNA and has never been licensed or otherwise authorized to use the CUNA brand on its Website.  In 2010, CUNA demanded that HMCU cease and desist from using the CUNA brand.

e.  McDuffie and HMCU did not loan or invest HMCU CD investor funds; rather, McDuffie placed investor funds in accounts held by HMCU at financial institutions, and he then used them for personal and business expenses.

33.     Each of the misrepresentations and omissions to investors regarding HMCU's structure, operation and regulation as a credit union was material to investors because investors believed that they were purchasing CDs from a legitimate, regulated credit union.

34.     HMCU and McDuffie each knew or recklessly disregarded that the misrepresentations and omissions to investors described herein, regarding HMCU's structure, operation and regulation as a credit union, were materially false and misleading.

**ii.   Insurance Covering Investor Funds**

35.     HMCU and McDuffie made numerous, written representations to investors that their funds invested in HMCU CDs were privately insured through Lloyd's of London, which is known as the world's specialist insurance market.  These include:

a.  From at least October 28, 2008 to early February 2009, the following statement was posted on HMCU's Website:  "Your deposits are insured up to $100,000 through Lloyd's of London."

b.  In late 2008 or early 2009, HMCU sent a CD investor a letter that stated, in part, "[y]our funds are insured up to $100,000 per account through Lloyd's of London."

c.  In December 2008 and January, March and May 2009, HMCU issued Certificate of Deposit and Disclosure Statements that stated "LLOYD'S" at the bottom.

d.  In approximately January 2009, HMCU sent an investor a December 2008 account statement that stated, in part, "** Insured to $100,000 Lloyds-London**."

e.  In 2009, HMCU sent an investor a "welcome" document that stated, in part: "Insurance:  Are [sic] funds are insured through Lloyds of London up to $100,000 per account."

f.  In 2009, HMCU sent an investor a "Membership Account Disclosure Agreement" that referenced insurance provided by Lloyd's in two sections, including one that stated:  "Insurance Coverage:  This institution is privately insured through Lloyd's of London Share Insurance, which allows us to insure each of your accounts up to $100,000."

g.  In approximately November 2009, HMCU caused a "Future Member" letter from "HMCU Staff" to be handed out at its branch in St. Thomas, U.S. Virgin Islands. The letter stated, in part:  "Note:  Your new account is a Virgin Islands account and will not be subject to federal taxes.  This institution will not mail 1099-INT forms at the end of the year.  Your funds are insured up to $100,000 per account through Lloyds [sic] of London."

36.  McDuffie also orally represented to three investors that the funds placed in HMCU CDs were insured.  Specifically:

a.  During a telephone conversation that occurred in approximately December 2008, one investor was told by an HMCU representative, believed to be McDuffie, that he should submit two applications for separate HMCU CDs in denominations of

$100,000 and $50,000 because HMCU CD's were insured up to $100,000 per separate account, and dividing up his investment would ensure that the entire investment was insured.

b.  At various times between approximately January 2009 and April 2010, McDuffie told another investor that his CD investments, totaling approximately $365,500, were insured by Lloyd's or by the Virgin Islands' Government.

c.  McDuffie told another investor, who first invested in 2009, that his funds were insured up to $250,000 by Lloyd's.

37.   In all written information provided to investors and oral conversations during the HMCU CD offering, HMCU and McDuffie have omitted the material information that investor deposits were not insured.

38.   HMCU's and McDuffie's written and oral representations were false because HMCU CD investor deposits have never been insured by Lloyd's or any government entity.

39.   Further, Lloyd's representatives repeatedly told McDuffie and HMCU to cease from referencing Lloyd's on HMCU's website and marketing materials.  For example, on or about January 13, 2009, a Lloyd's representative sent Jilaphun, Inc. a letter stating that HMCU's use of Lloyd's name on its Website was "unauthorized,"  "false and misleading," and demanded that HMCU "cease and desist any and all use of the Lloyd's name."

40.   Each of the misrepresentations and omissions to investors regarding insurance covering investor deposits was material to investors because investors believed that the funds they used to purchase HMCU CDs were secure and insured.

41.     HMCU and McDuffie each knew or recklessly disregarded that the misrepresentations and omissions to investors described herein, regarding insurance covering investor deposits, were materially false and misleading.

**D.     McDuffie and HMCU Misappropriated CD Investor Funds**

42.     HMCU and McDuffie raised at least $532,000 in investor funds by selling unregistered securities that they described as CDs.  Investors wired funds to U.S. commercial banks accounts in the name of HMCU or provided the funds via check and McDuffie then caused the funds to be deposited directly into U.S. commercial bank accounts in the name of HMCU, which were controlled by McDuffie.

43.     Following the deposit of HMCU CD investors' funds in HMCU bank accounts, there was no apparent lending or re-investment of those funds, as would occur at a legitimate credit union or other financial institution.  Instead, balances in the accounts were spent on apparent HMCU business expenses, as well as the personal expenses of McDuffie, including payments for:

a.   flight lessons and fuel;

b.   rent for apartments and office space;

c.   real-estate related expenses;

d.   credit union software;

e.   law firms; and

f.   travel.

44.     From at least December 2008 to the present, in all written information provided to investors and oral conversations during the HMCU CD offering, HMCU and McDuffie have omitted the material information that McDuffie and HMCU were not loaning or investing

investor funds as a legitimate credit union would, and were instead misappropriating investor funds for business and personal expenses.

45.     McDuffie and HMCU's misappropriation and omissions were material to investors.

46.     HMCU and McDuffie each knew or recklessly disregarded that the misappropriation and omissions described herein, regarding the use of investor funds, were material, false and misleading.

E.     **HMCU and McDuffie Engaged in a Scheme and Fraudulent Practices or Course of Business to Defraud HMCU CD Investors**

47.     Since at least 2008, HMCU and McDuffie have engaged in a scheme and fraudulent practices or courses of business to defraud HMCU CD investors by, among other things, misappropriating investor funds, making the misleading statements and omissions described herein, and making lulling statements to investors.

48.     In furtherance of the scheme, McDuffie knowingly or recklessly engaged in numerous practices or courses of business that defrauded HMCU CD investors, including, but not limited to:

     a.   Opening, structuring and operating HMCU as an internet and U.S. Virgin Islands based credit union, and avoiding federal or state regulation following the involuntary liquidation of JEFCU;

     b.   Holding HMCU out to the public as a legitimate, regulated credit union on its Website and in written materials;

     c.   Misappropriating HMCU CD investor deposits; and

     d.   Lulling investors by misrepresenting the reasons for HMCU's inability to pay interest or redeem principal due to its investors.  Specifically, from at least the

summer of 2011 through the beginning of 2012, two of HMCU's largest investors made multiple inquiries to McDuffie about the status of their CD investments. In response, McDuffie falsely claimed that HMCU's payment of amounts owed to the investors was dependent upon the successful resolution of HMCU's disputes with various U.S. commercial banks.

**F.     HMCU's Purported CDs are Securities**

49.     Since at least December 2008, McDuffie and HMCU have used its Website to offer and sell the purported CDs to investors. The purported CDs are both notes and investment contracts and, therefore, are securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

50.     The purported CDs are notes, which are presumed to be securities, and the CDs do not bear a strong resemblance to the enumerated non-securities recognized by the courts. Individual investors sent money to HMCU by wiring funds to HMCU bank accounts, or by mailing checks to HMCU. HMCU's investors purchased the CDs because they sought to make a profit from above-market annual interest rates offered by HMCU, and McDuffie and HMCU's purpose in issuing the CDs was to raise money for McDuffie's and HMCU's expenses. The purported CDs were offered and sold to a broad segment of the public, and were specifically offered and sold to individuals, evidencing that the plan of distribution involved common trading. McDuffie and HMCU held out the CDs as investments and there are no countervailing factors that would lead a reasonable person to question that characterization. There is no risk-reducing scheme that makes application of the federal securities laws unnecessary.

51.     The CDs are also investment contracts because investors made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the

efforts of McDuffie and HMCU.  The investors were not required or expected to do anything besides provide funds in order to receive their returns.

**G.      The HMCU CD Offering Was Not Registered with the SEC or Exempt from Registration**

52.      Section 5 of the Securities Act prohibits any offers, directly or indirectly, to sell a security unless a registration statement for that security has been filed with the SEC.   A registration statement is transaction specific.  Each sale of a security must either be made pursuant to a registration statement or fall under a registration exemption.

53.      At the time of McDuffie's and HMCU's offers and sales of the CDs, there were no registration statements filed and in effect, and no registration exemption applied to the offering of interests in the CDs.

54.      HMCU's offering was not registered with any state securities authority.

55.      McDuffie and HMCU offered and sold securities in the form of HMCU CDs to investors using the means or instruments of interstate commerce including, but not limited to, telephones, the internet, and the mails.

56.      HMCU's securities were offered nationwide, and were issued to investors in at least two states and the U.S. Virgin Islands.

57.      McDuffie and HMCU failed to provide investors with the information required under Rule 502(b) of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

58.      McDuffie and HMCU engaged in a general solicitation through HMCU's Website, as well as through the ads placed on eBay and Google.

**H.      HMCU and McDuffie Have Profited From the Fraudulent Scheme**

59.      HMCU and McDuffie unjustly profited by selling HMCU securities in a fraudulent, unregistered offering.

60.     Through September 2012, HMCU raised at least $532,000 from its investors.

61.     Since 2008, HMCU has used investor funds for a variety of business expenses.

62.     McDuffie has profited from HMCU's fraudulent offering by, among other things, directing HMCU to pay numerous personal expenses, including rent, flight lessons and fuel.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities**
**Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]**
**(Defendants McDuffie and HMCU)**

63.     The SEC incorporates the allegations of paragraphs 1 through 62 as if fully set forth herein.

64.     Defendants McDuffie and HMCU, directly or indirectly in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:  (a) employed a device, scheme or artifice to defraud with scienter; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities in violation of Section 17(a) of the Securities Act.

65.     By reason of the foregoing, Defendants McDuffie and HMCU have violated, and unless restrained and enjoined will in the future violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Fraud in the Purchase or Sale of Securities**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Defendants McDuffie and HMCU)**

66.     The SEC incorporates the allegations of paragraphs 1 through 62 as if fully set forth herein.

67.     Defendants McDuffie and HMCU, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

68.     By reason of the foregoing, Defendants McDuffie and HMCU have violated, and unless restrained and enjoined will in the future violate, Exchange Act Sections 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Fraud -- Control person Liability**
**Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]**
**(Defendant McDuffie, Alternatively)**

69.     The SEC incorporates the allegations of paragraphs 1 through 62 as if fully set forth herein.

70.     Defendant HMCU violated Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] by having, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security:  (a) employed

devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

71.     Defendant McDuffie, as HMCU's chief operating officer, exercised control over the management, general operations, and policies of HMCU, as well as the specific activities upon which HMCU's violations are based.

72.     By reason of the foregoing, Defendant McDuffie violated, and unless restrained and enjoined will in the future violate, Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

**FOURTH CLAIM FOR RELIEF**
**Sale of Unregistered Securities**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**
**(Defendants McDuffie and HMCU)**

73.     The SEC incorporates the allegations of paragraphs 1 through 62 as if fully set forth herein.

74.     Defendants McDuffie and HMCU, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise, and carried or caused to be carried through the mails, or in interstate commerce, by means or instruments of transportation, such securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities.

75.     By reason of the foregoing, Defendants McDuffie and HMCU have violated, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## VII.    PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint, and unless restrained will continue to do so;

### II.

Enter Injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating the laws and rules alleged against them in this Complaint;

### III.

Order that each of the Defendants disgorge any and all illegal gains, together with pre-judgment and post judgment interest;

### IV.

Order that each of the Defendants pay civil money penalties pursuant to pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and

### V.

Order such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The SEC demands a jury trial in this matter.

DATED:   November 8, 2012

s/ Thomas J. Krysa
Thomas J. Krysa
Danielle R. Voorhees
U.S. Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
Ph.:  (303) 844-1000
Email:   krysat@sec.gov
           voorheesd@sec.gov
*Attorneys for Plaintiff*