IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02939

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

STANLEY B. MCDUFFIE
(f/k/a STANLEY ROBERSON AND STANLEY BATTLE),
and
JILAPUHN, INC. (d/b/a HER MAJESTY'S CREDIT UNION),

      Defendants.

---

## ORDER ON MOTON FOR SUMMARY JUDGMENT

**Kane, J.**

# I. INTRODUCTION

This is a civil enforcement action by the Securities and Exchange Commission

("SEC") against Jilapuhn, Inc. ("Jilapuhn"), doing business as Her Majesty's Credit

Union ("HMCU") and its principal, Stanley McDuffie ("McDuffie")[1](collectively,

"Defendants").   The SEC moves under Fed.R.Civ.P.56 for summary judgment on all

claims alleged against HMCU and McDuffie in this matter's Complaint, the gist of which

alleges that the Defendants misled investors, sold unregistered certificates of deposit

(CDs) and misappropriated over $500,000 worth of investors' funds, Doc.26.   As

explained below, because no genuine issue exists as to any material fact, summary

judgment in favor of the SEC is appropriate as a matter of law in all respects.

---

[1] Stanley McDuffie was formerly known as Stanley Roberson; he changed his name to McDuffie in 2010.
I refer to him as McDuffie throughout this Order.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the [SEC] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material when it would affect the outcome of the case. *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1145 (10th Cir. Kan. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

To survive summary judgment, Mr. McDuffie must demonstrate the existence of a genuine issue of fact by citing to the record or by showing that the materials cited by the SEC are disputed. Fed.R.Civ.P. 56(c)(1); *Anderson*, 477 U.S. at 248. His assertions "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). All of the evidence will be viewed in the light most favorable to Mr. McDuffie. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. FACTS[2]

In 1997, Mr. McDuffie obtained a corporate charter for Jilapuhn, Inc., in Georgia, and later incorporated in Colorado in 2004 and the U.S. Virgin Islands in 2005. Gegenheimer Decl. ¶ 2, Ex. 1, McDuffie p. 23 ll. 1-15, p. 24, ll. 9-12. Acting as CEO,

---

[2] Facts are undisputed unless otherwise noted. Where a fact is "disputed," it is because Defendants deny it. Because these disputed facts either directly contravene other facts that Defendants elsewhere admit or are denied without explanation and supported by record evidence, I find that no dispute of fact is "genuine."

Answer ¶ 11 (Doc. #12), Mr. McDuffie operated Jilapuhn as two separate credit unions[3] in Georgia and the U.S. Virgin Islands between 2005 and 2011.  Gegenheimer Decl. ¶ 3, Ex. 2, Undisputed Facts c-f, q, r.

### A. Jilapuhn Employees Federal Credit Union

On January 25, 2005, Mr. McDuffie opened Jilapuhn Employees Federal Credit Union ("JEFCU") in Atlanta, Georgia, after receiving a charter from the National Credit Union Administration ("NCUA").  Gegenheimer Decl. ¶¶2, 3 Ex. 1, McDuffie, p. 30 ll. 14-23, Ex. 77; Undisputed Facts q, r.   The NCUA charter included a Letter of Understanding and Agreement ("LUA") that set out the requirements for JEFCU's operations. *Id.* (¶2(c)(4) p. NCUA 001385-1389 with signed copy attached). Mr. McDuffie sold shares in JEFCU as CDs to investors, Gegenheimer Decl. ¶ 3, Ex. 2, Undisputed Facts j, which were insured by the National Credit Union Share Insurance Fund ("NCUSIF"), Gegenheimer Decl. ¶¶2, 3, Ex. 2, Stipulated Facts r., Ex. 1, McDuffie pp. 30 ll. 18-21, 66 ll. 9-17.

---

[3]A credit union is "[a] cooperative association that offers low-interest loans and other consumer banking services to persons sharing a common bond — often fellow employees and their family members." Black's Law Dictionary (9th ed. 2009). The National Credit Union Administration ("NCUA") regulates most credit unions (in addition to state-specific regulation of state-chartered credit unions). *Id.* Federal credit unions are authorized by the Federal Credit Union Act of 1934 (FCU Act), 12 U.S.C. §1751 *et seq.*; Gegenheimer Decl. ¶4, Ex. 3, Report of Robert M. Fenner, President and CEO of RMF Consulting, LLC, expert report for the SEC.

> The SEC notes five factors that distinguish credit unions from other financial institutions:
>> (1) Credit unions are member-owned, and each member is entitled to one vote in selecting board members; (2) Credit unions do not issue capital stock. They create capital, also known as net worth, by retaining earnings;  (3) Credit unions rely on unpaid volunteer board of directors, elected from the membership; (4) Credit unions operate as non-profits; and, (5) Credit unions accept members only from those in their articulated field of membership.

U.S. Treasury Department Study, "Comparing Credit Unions With Other Depository Institutions," January 2001.

On March 31, 2005, the NCUA completed an onsite review of JEFCU and found "substantial noncompliance" with the terms of the LUA. Ex. 4 (¶2(c) pp. NCUA 001372-76).   The report cited problems with negative share account handling, compliance, recordkeeping, operating exceptions, law violations, and unsound policies, practices, or procedures.  *Id.*   NCUA's findings of unsound practices at JEFCU included:

> **(1) Impermissible Loans:** The LUA mandated that no loans could be made to any member in excess of ten percent of unimpaired capital and surplus. After its formation, however, JEFCU immediately made loans to members in excess of the requirements of the LUA. These loans mainly were made to Mr. McDuffie or Jilapuhn.
>
> **(2) Unsafe and Unsound Lending Practices:** The credit union had a total net worth on March 31, 2005, of $3,176, yet had two unsecured loans to a single borrower totaling $14,534. That borrower was Jilapuhn. JEFCU had unsecured lines of credit but there was no analysis of the Jilapuhn's ability to repay the loans.
>
> **(3) Compliance Risks:** The credit union had no policies to comply with the Bank Secrecy Act, the Patriot Act, or the Office of Foreign Assets Control.
>
> **(4) Transaction Risks:** There were inaccurate account balances and a lack of reconciliation of accounts.

Pl.'s Mot. Summ. J. ¶ 14 (citing the Ex. 4, NCUA letter) (numbers added).

Further examinations by the NCUA in May 2005 also found that JEFCU's website misled investors by advertising high certificate rates based only on speculative fee income. Ex.4 (¶2(c)(7) pp. NCUA 000480-81. The NCUA also found that Mr. McDuffie had hired his brother as manager of JEFCU and placed his father on the Board of Directors, despite neither of them having the formal training required by the LUA. Pl's Mot. Summ. J. ¶ 13; Gegenheimer Decl. ¶5, Ex. 4 (¶2(c)(1) p. NCUA0001387) (requiring that "the directors, supervisory committee, and president will receive formal training in

4

all areas applicable to their respective positions").[4] The NCUA also found that Jilapuhn, JEFCU's sponsor company, was inappropriately involved in the daily operations of the credit union: Jilapuhn was paying sponsor bills and wiring money to Jilapuhn employees with the JEFCU account.[5] Ex. 4 (¶2(c)(9) pp. NCUA 001453-1461). The NCUA concluded: "Mr. Roberson's [McDuffie] motives for organizing the credit union are questionable."[6] *Id.* (p. NCUA 0001453); Pl.'s Mot. Summ. J. ¶ 19. The NCUA warned Mr. McDuffie about JEFCU's violations, and the parties agreed to a Document of Resolution ("DOR") that set a schedule for identifying and fixing JEFCU's problems. Gegenheimer Decl. ¶5 Ex. 4 (¶2(c)(8) p. NCUA 000717-719).

The problems persisted, however, and after JEFCU failed to make progress toward compliance by the end of the DOR's deadlines for action, the NCUA issued a Notice of Involuntary Liquidation and Revocation of Charter in August 2005. NCUA 001460; Gegenheimer Decl. ¶2, 5, Ex. 1, McDuffie p. 74, Ex. 78.; Ex. 4 (¶2(c)(10) pp. NCUA 000221-227). JEFCU did not cooperate in this liquidation and instead filed a lawsuit against the NCUA on September 2, 2005, which sought to enjoin the NCUA's liquidation. *Jilapuhn Employees Federal Credit Union v. National Credit Union Administration,* No. 05-2306 (U.S.D.C.N.D.G. September 2, 2005). The court rejected the motion for an injunction and ordered JEFCU to comply with the NCUA's liquidation procedures. Gegenheimer Decl. ¶1, 3, Ex. 2, Undisputed Fact s, t; Ex. 1, McDuffie pp. 75-76, Ex. 79, 80.

---

[4] Defendants dispute this fact without support.
[5] Defendants dispute this fact without support.
[6] Defendants dispute this fact without support.

### B. Her Majesty's Credit Union

On August 25, 2007, Mr. McDuffie applied for a territory credit union charter from the U.S. Virgin Islands (USVI) Division of Banking and Insurance. Also in 2007, he obtained a license from the USVI Department of Licensing and Consumer Affairs ("DLCA") to operate Jilapuhn as HMCU.  Gegenheimer Decl. ¶ 1, 3, Undisputed Facts g; McDuffie p. 52 ll. 17-21. Although the Virgin Islands Code authorizes the charter and regulation of credit unions, 13 V.I.C. 588, HMCU was registered under a "territory charter" and not subject to the type of oversight and auditing procedures that regulate federally- and state-chartered credit unions.  Pl.'s Mot. Summ. J. ¶ 9; Comp. ¶ 18.  In fact, HMCU was never examined nor audited by any agency of the USVI. Gegenheimer Decl. ¶3, Ex. 2, Undisputed Fact g; Answer (Doc. #12) ¶32.

HMCU offered CDs to investors at interest rates as high as 7.75%. Gegenheimer Decl. ¶3, Ex. 2, Undisputed Facts j,k; Ex. 1, McDuffie p. 65 ll. 10-13, p. 136-139, p. 145 ll. 23-25, p. 146 ll. 1-5. The CDs were advertised on the HMCU website.[7] Undisputed Facts j, k, Gegenheimer Decl. ¶6, Ex. 5, Jung Deposition p. 16, Ex. 1. The Defendants told investors that the CDs were insured by Lloyds of London on the HMCU website, on investor application forms, and in oral statements made by Mr. McDuffie. Gegenheimer Decl. ¶2, Ex. 1, McDuffie pp. 132 ll. 1-25, 133 ll.1-14, 137 ll.1-25, 138 ll. 1-3.

In fact, the CDs were *not* insured.  Mr. McDuffie asserts, however, that he was under the mistaken belief that, at least for a time, the CDs were insured.  Defendants

---

[7] Defendants dispute this fact without support and despite prior stipulations as to its truth and admitting that HMCU's CDs were advertised on Google and provided a link to the credit union's website, where the CDs were also advertised. *See* Def.'s Resp. 1-2.

support this assertion by attaching Exhibit D to McDuffie's Affidavit.  But Exhibit D is only two pages of a seven page insurance policy. The complete policy is attached as Exhibit B to the Declaration of Nancy Gegenheimer.  It is clear on the face of the policy that the policy is liability insurance, not share insurance. Liability insurance covers HMCU the institution against losses such as robbery, burglary, and theft. See Ex. B to Gegenheimer Declaration, policy page VIAG0000011. There is no share insurance covering the deposits of CD purchasers; the liability insurance only protects for losses of property on the premises. According to Mr. McDuffie none of the CD deposits were kept on the premises, but instead were deposited into Jilapuhn's bank account. McDuffie ¶ 23. Even if I were to credit Mr. McDuffie's ignorance theory regarding share versus liability coverage, he later admits that he knew HMCU carried *no* insurance after November 2008 because it was cancelled retroactive to September 2008 due to nonpayment by HMCU. McDuffie ¶¶ 8, 9, 10, 17, 18, 26, 27, Response ¶ 6.  Mr. McDuffie admits that he did not tell investors that their CDs were uninsured even after knowing that they were uninsured because he "thought the situation could still be rectified" by legislative means.  The bill Mr. McDuffie references, however, was not even considered until 2011, after HMCU stopped selling CDs. In total, investors purchased $532,591.97 worth of uninsured CDs from HMCU.[8] Gegenheimer Decl. ¶¶3, 7, Ex. 2, Undisputed Facts o; Ex. 6, CD investor list; Answer ¶60.  The CDs were never registered with the SEC.

---

[8] Defendants deny ¶ 29 of the SEC's motion, which states this fact. However, they have otherwise admitted that they raised $532,000 from the sale of HMCU CDs to investors. Def.'s Resp. 2. It is also undisputed that the CDs were unregistered and that HMCU's investors lost money when the credit union shut down. Gegenheimer Decl. ¶2, Ex. 1, McDuffie p. 126, ll. 7-9.

In the Defendants' Response to the present motion and in Mr. McDuffie's deposition, the Defendants admit that "McDuffie and HMCU repeatedly made the material misrepresentation that CD investor funds were insured. *Id.*, McDuffie pp. 65 ll. 10-13, 133 ll. 4-14, 136-139." Pl.'s Mot. Summ. J. ¶ 45. Furthermore, they admit that "McDuffie and HMCU misappropriated all investor funds, the CD investors suffered a total loss of their investments when HMCU ceased operations." *Id.* ¶ 44. The Defendants also admit to making the following additional misrepresentations on the HMCU website about the nature of the credit union's business: "We have no stockholders—no outside third parties to exert influence. Each member has one vote in annual elections regardless of the amount of money they have deposited in the credit union." Gegenheimer Decl. ¶3, Undisputed Facts j, k, m, n.

### C. Examples of investor reliance on misleading statements

#### i. Edward Jung

Eighty-four-year-old California resident Edward Jung has been investing in legitimate, insured credit unions since 1995. Gegenheimer Decl. ¶ 6, Ex. 5 Jung 14-15, 61. After finding HMCU's website on the Internet, Mr. Jung spoke with Mr. McDuffie about investing in HMCU's CDs. Id. at 16. His investor application with HMCU and Mr. McDuffie both stated that the CDs were insured by Lloyd's of London, which Mr. Jung believed. Id at 19. Mr. Jung invested a total of $363,551 in HMCU, which was all lost. Gegenheimer Decl. ¶6,7, Jung 22, 26, 29, 31, 32, 38, 43, 52, Ex. 5, 6, 8, 10, 12, 13, 24, 31; Gegenheimer Decl ¶7 Ex. 6.

#### ii. Ahmed Abouelazm

Seventy-two-year-old Florida resident Ahmed Abouelazm also found HMCU's website offering CDs for sale online. Gegenheimer Decl. ¶ 8, 2; Ex. 7, Declaration of Ahmed Abouelazm. He had multiple conversations with Mr. McDuffie about his investments, and he received a letter and an account statement from the Defendants confirming that his funds were insured by Lloyd's up to $100,000. Abouelazm Decl. ¶¶ 3-6, 10-13, 19. Mr. Abouelazm believed that his investment was insured, but also lost the funds he invested in HMCU CDs.

## IV. DISCUSSION

The SEC requests a judgment finding that (1) the Defendants sold fraudulent and unregistered securities to investors, made misleading statements and omissions and profited from these misrepresentations in violation of §§ 5(a), 5(c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b); (2) the Defendants engaged in a scheme to defraud in violation of § 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3), § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a);  or, alternatively, (c) Mr. McDuffie is liable as a control person under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, for HMCU's violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The SEC requests permanent injunctions against the Defendants enjoining them from further violations of the securities laws, disgorgement of ill-gotten gains plus prejudgment interest thereon, and third-tier civil penalties pursuant to § 20(d)

9

of the Securities Act, 15 U.S.C. § 77t(d), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).   For the reasons that follow, I GRANT in totem the relief the SEC seeks, including finding Mr. McDuffie primarily liable for the violations alleged and accordingly discarding the alternate control person liability claim.

### A. *The CDs were unregistered securities and their sale violated Section 5(a) and 5(c) of the Securities Act.*

Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77(e)(a) and (c)] impose liability on persons who "directly or indirectly" offer or sell securities through interstate commerce unless a registration statement has been filed and is in effect. *SEC v. Int'l Chem Dev. Corp* 469 F. 2d 20, 27 (10th Cir. 1972); *SEC v. Parrish,* 2012 U.S. Dist. LEXIS 137544 (D. Colo. September 25, 2012).

To establish a prima facie case for a violation of Section 5 of the Securities Act, the SEC must demonstrate: (1) that no registration statement with the SEC was in effect for the securities; (2) that the defendant directly or indirectly sold or offered to sell the securities; and (3) that interstate means were used in connection with the offer or sale. *Europe and Overseas Commodity Traders v. Banoue Paribas London,* 147 F.3d 118, 124 n.4 (2d Cir. 1998); *SEC v. North American Research and Development Corp.*, 424 F.2d 63 (2d Cir. 1970); *Neuwirth Inv. Fund, Ltd. v. Swanton*, 422 F. Supp. 1187, 1193 n.8 (S.D.N.Y. 1975). The SEC need not establish scienter. *Aaron v. SEC*, 446 U.S. 680, 714 (1980); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-860 (S.D.N.Y. 1997). Under Section 5, all "those who had a necessary role in the transaction are held liable as participants." *SEC v. Murphy*, 626 F.2d 633, 650-51 (9th Cir. 1980); *see also SEC v.*

*Holschuh*, 694 F.2d 130, 139-40 (7th Cir. 1982) (citing *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959)). Once the SEC establishes a prima facie violation of Section 5, the burden shifts to the defendants to demonstrate that a claimed exemption from registration applies. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953); *SEC v. North American Research and Development Corp*., 424 F.2d 63 (2d Cir. 1970). *SEC v. Culpepper*, 270 F.2d 241, 246 (2d Cir. 1959). Because "public policy strongly supports registration," any exemption from registration "must be strictly construed against the person claiming its benefit." *Reves and Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

### 1. The CDs are securities.

As an initial matter, for Sections 5(a) and 5(c) of the Securities Act to apply, the CDs must be a security. In analyzing whether the CDs are a security, the overarching presumption, rooted in statutory law, is that a "security" includes "virtually any instrument that might be sold as an investment," "in whatever form they are made and by whatever name they are called." *SEC v. Edwards,* 540 U.S. 389, 391 (2004), *citing, Reves v. Ernst & Young,* 494 U.S. 56, 61 n. 1 (1990). "Congress' intent [was] to regulate the entire body of instruments sold as investments." *Id*. at 64. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define a "security" for purposes of the federal securities laws to include notes, stock, certificates of participation in profit-sharing agreements, and investment contracts. [9] A bank CD is simply a promissory note from the bank to the depositor. A note's presumed status as a security is confirmed when

---

[9] The Securities Act, Section 2(1), and the Exchange Act Section 3(a)(1), define security slightly different, however, the Supreme Court has consistently held that the definitions are virtually identical and the coverage of the two Acts may be considered the same. *Marine Bank v. Weaver*, 455 U.S. 551 (1982).

the parties are motivated by an investment purpose, the note is sold to a broad segment of the public, a reasonable investor would consider the note to be an investment, and alternative regulatory schemes do not significantly reduce the risk of the instrument. *See Reves v. Ernst & Young,* 494 U.S. 56, 66-69 (1990).

Here, the CDs are securities since they meet the four factors set out in *Reves*. First, the parties were motivated to make an investment. McDuffie and HMCU offered an investment with a fixed rate of return and the investors desired the same. Second, the CDs were advertised over the internet and ads were placed on eBay. Thus, the CDs were offered and sold to a broad segment of the public. Notably, HMCU did not limit the sale of the CDs to "members" of the credit union, anyone who found the advertisement on the internet could buy a CD. *See Reyes* at 68. Third, the objective expectations of the investing public were such that they believed the CDs were securities. The CDs were advertised as investments paying high interest. Finally, there were no risk-reducing factors; the CDs were not insured and were uncollateralized. *Reves* at 61; *Marine Bank* at 557. The CDs were not subject to any regulatory scheme since HMCU was not a federally or state chartered bank or credit union. Accordingly, based on these factors, the CDs meet all the requirements established in *Reves*, and they are notes that are presumed to be securities.

The CDs were also investment contracts under the requirements established in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946). The Supreme Court defined an investment contract as: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third

party. *Id.* The Supreme Court has given *Howey* a flexible and broad interpretation, focusing on the "presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

Here, the purchasers of CDs made an investment of money in a common enterprise with the expectation of receiving interest and return of the principal at the end of the term, satisfying both the first and second elements of *Howey*. *SEC v. U.S. Reservation Bank & Trust,* 289 Fed. Appx. 228, 229 (9th Cir. 2008)(CDs were an investment contract, and thus a security, because purchasers were required to make an investment of money in a common enterprise). *See McGill v. American Land & Exploration Co.* 776 F. 2d 923, 925 (10th Cir. 1985)(the economic reality of the transaction guides security determination); *SEC v. Art Intellect, Inc.* 2013 U.S. Dist. LEXIS 32132 (D. Utah 2013)(determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit). In addition, the HMCU CD investments were passive – investors expected to earn profits in the form of interest solely from the efforts of HMCU. *SEC v. Art Intellect, Inc.* 2013 U.S. Dist. LEXIS 32132 *47. As such, the CDs were investment contracts. Other courts have found CDs to be investment contracts. *Gary Plastic Packaging Corporation v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F. 2d 230, 241 (2d Cir. 1985); *Safeway Portland Employees' Federal Credit Union v. C.H. Wagner & Co., Inc.,* 501 F. 2d 1120 (9th Cir. 1974); *SEC v. U.S. Reservation Bank & Trust,* 289 Fed. Appx. 228, 229 (9th Cir. 2008).

**2. The undisputed facts establish a prima facie violation of Section 5 and Defendants fail to satisfy their burden of proving exemption.**

Because it is undisputed (1) that no registration statement with the SEC was in effect for the HMCU CD securities; (2) that Mr. McDuffie and HMCU directly or indirectly sold or offered to sell the securities; and (3) that interstate means (e.g. mail and internet services) were used in connection with the offer or sale, the SEC has met its prima facie burden of establishing a violation of Section 5.   Accordingly, the burden shifts to the Defendants to establish a valid exemption to the securities registration rules.

Defendants claim an exemption under Section 3(a)(2) of the Securities Act, which provides that any security issued or guaranteed by a bank is outside the registration requirement.  A "bank" is defined broadly to mean any United States national bank, or any banking institution organized under the law of any state in the United States, territory of the United States, or the District of Columbia, the business of which is substantially confined to banking and is supervised by the state or territorial banking commission or similar official.  Defendants claim that HMCU is within the definition of "bank" because the USVI is a territory of the United States and the USVI licensed HMCU.  Defendants fail to complete their theory that HMCU is a "bank" for registration purposes, however, because they have not shown that HMCU is "supervised by the state or territorial banking commission or similar official."

As discussed above, HMCU was not insured or regulated or supervised by any federal or state or territorial institution. Thus, failing to apply the registration requirements of the securities laws to the CDs at issue would contravene Congress'

primary purpose in enacting the securities laws: to protect investors in the risk-based securities market. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004).  Defendants point out that it is unnecessary to subject issuers of bank certificates of deposit to liability under antifraud provisions of federal securities laws because holders of bank certificates of deposit are abundantly protected under federal banking laws. This argument is inapplicable to the facts of this case, however, because there was no protection for HMCU CD purchasers.   Defendants citation to *Marine Bank v. Weaver* is wholly inapposite because in *Marine Bank*, the bank was federally regulated, subject to comprehensive regulations governing the banking industry and the certificates were insured by the Federal Deposit Insurance Corporation. 455 U.S. at 558.

Defendants' citation to *SEC v. United Benefit Life Ins. Co*., 387 U.S. 202 (1967), is also not helpful. *United Benefit Life* involved the registration exemption under Section 3(a)(8) of the Securities Act for companies that are regulated as conducting the "business of insurance." *See SEC v. National Securities, Inc*., 393 U.S. 453 (1969); *American Mutual Reinsurance Company v. Calvert Fire Insurance Company,* 367 N.E. 2d 104, 109 (App. Ct. Ill. 1977), *cert. denied*, 436 U.S. 906 (1978) (insurance contracts are not considered securities within the meaning of the [Securities] acts). Jilapuhn doing business at HMCU was not an insurance company, the CDs sold by HMCU were not insurance contracts and the exemption simply does not apply.  Furthermore, according to *United Benefit Life*, I do not even have to decide whether Jilapuhn is a bank to call a spade a spade.  In *United Benefit Life the* defendant bank sold "Flex Fund Annuity" contracts. These instruments were considered securities. 387 U.S. at 208.

Defendants have failed to carry the burden of proving that the CDs were exempt. Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") impose liability on persons who directly or indirectly offer or sell securities through interstate commerce unless a registration statement has been filed and is in effect. The CDs were unregistered securities and summary judgment is GRANTED to the SEC on its Securities Act Section 5(a) and 5(c) claims.

## B. Defendants violated the antifraud provisions of the Securities Act and the Exchange Act.

The SEC alleges that the Defendants violated the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. §77(q)] and Section 10(b) of the Exchange Act [15 21U.S.C.§78(j)] and Rule 10b-5 enacted thereunder [17 C.F.R. §240.10b-5]. Section 17(a) of the Securities Act makes it unlawful for any person in the offer or sale of a security, directly or indirectly to 1) employ any device, scheme, or artifice to defraud; or 2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or 3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b) of the Exchange Act prohibits anyone, directly or indirectly, from employing any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the

public interest or for the protection of investors. *SEC v. Wolfson,* 539 F. 3d 1249, 1256

(10th Cir. 2008); *Geman v. SEC,* 334 F. 3d 1183, 1192 (10th Cir. 2003). The SEC

promulgated rule 10b-5 in accordance with its authority under the statute.[10]

The antifraud provisions are "to be construed 'not technically and restrictively' but

flexibly to effectuate their remedial purposes." *Affiliated Ute Citizens v. United States,*

406 U.S. 128, 151 (1972)(internal quotation omitted).   Fundamentally, both Section

17(a) of the Securities Act and Section 10(b) of the Exchange Act are designed to protect

"investors from fraudulent practice." *SEC v. Wolfson,* 539 F. 3d at 1257; *SEC v. Smart,*

678 F. 3d 850, 856 (10th Cir. 2012).

**1. Defendants' violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a)(2) of the Securities Act by making material misrepresentations with scienter.**

**a.   Defendants violated Section 10(b) and Rule 10b-5(b).**

To prove a misstatement or omission under Exchange Act Section 10(b) and Rule

10b-5(b), the SEC must demonstrate that the Defendants directly or indirectly: (1) each

made an untrue statement of material fact or omitted to state a material fact; (2) with

---

[10] Rule 10b-5 provides: It shall be unlawful for any person, directly or indirectly,…(a) to employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. The scope of Rule 10b-5 is coextensive with the coverage of Section 10(b). *SEC v. Zandford,* 535 U.S. 813, 816 n. 1 (2002).

scienter; (3) in connection with the purchase or sale of a security[11]; and (4) using any means of interstate commerce or of the mails[12]. 7 17 C.F.R. § 240.10b-5(b).

Under Rule 10b-5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011). A defendant is liable for his or her own oral misstatements and omissions. *See In re Textron, Inc.*, 2011 WL 4079085, at *6 (D.R.I. Sept. 13, 2011) (defendant CEO of company was maker under *Janus* of oral statements he made during investor conference calls); *SEC v. Dafoitis*, 2011 WL 3295139, at *3 (N.D. Cal. Aug. 1, 2011) (defendant concedes he was maker under *Janus* of oral statement he made during conference call).

As indicated above, defendants made several misrepresentations and omissions as follows:

**i. Defendants misrepresented that HMCU was a credit union**.

> • Defendants advertised HMCU as a credit union on various websites.

> • Defendants' claimed on the website "we have no stockholders…each member has one vote," but Jilapuhn was a for-profit company.

> • Defendants' claimed that they were regulated by the USVI.

**ii. Defendants misrepresented that the funds were insured**.

> • HMCU's website stated: "your deposits are insured up to $100,000

---

[11] As a threshold matter, as explained above, the Defendants sold securities.
[12] Defendants admit that they engaged in a general solicitation through HMCU's website as well as through ads placed on eBay and Google. Undisputed Facts h, i. As such, the jurisdictional means has been met.

through Lloyds of London."

• CD investor letters stated "your funds are insured up to $100,000 per account through Lloyd's of London."

• Mr. McDuffie told Mr. Jung and Mr. Aboulelazm that their funds were insured by Lloyd's of London or the government of the USVI.

• HMCU issued CD certificates that stated "Lloyd's."

• Investors' membership account disclosure agreements stated: "Insurance coverage: This institution is privately insured through Lloyd's of London Share Insurance, which allows us to insure each of your accounts up to $100,000.

• Defendants failed to inform investors that there was no insurance when they admit they knew there was no insurance.

Defendants attempt to dismiss their misrepresentations by suggesting that they were somehow immaterial. Information is considered material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell securities. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976) ([T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available). The existence of insurance against loss on investments would influence a reasonable investor's decision making or altering the total mix of investment information. Indeed, Mr. Jung explained that he had never lost money investing in credit unions because "they were insured."

*Smart*, 678 F. 3d at 857 (10th Cir. 2012) ([I]t would be material to a reasonable investor that his or her money was not being used as represented in safe investment strategies, but rather…for the payment of personal expenses). Simply put, Defendants cannot credibly argue that misstatements regarding whether the CDs were insured are immaterial.

The undisputed facts also show that Defendants acted with scienter. Scienter is the mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). In the Tenth Circuit, recklessness satisfies the scienter requirement. *Smart*, 678 F.3d at 856-57; *Hackbart v. Holmes,* 675 F. 2d 1114, 1117 (10th Cir. 1982). Proof of recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n. 30 (1983).

Mr. McDuffie admits that he knew definitively that the CDs were not properly insured at least by the time he spoke with John McDonald, a member of the Division of Banking and Insurance. He kept this knowledge to himself, however, and purposely declined to update HMCU's CD purchasers about the lack of insurance. For example, Mr. McDuffie admits that Mr. Jung's email correspondence always asked about insurance. Mr. McDuffie and Mr. Jung also spoke on the phone about insurance. Although Mr. McDuffie and Mr. Jung communicated about insurance after Mr. McDuffie admits to knowing that there was no insurance, Mr. McDuffie admits he did not tell Mr. Jung that the CDs were currently uninsured. It was at minimum reckless for Mr. McDuffie not to bring Mr. Jung into the loop when he knew from Mr. Jung's repeated inquiries regarding insurance that insurance was an important factor to his investment decision making process.

Because the facts establish that Mr. McDuffie  had the scienter to defraud, those facts are also sufficient to establish scienter to defraud on behalf of HMCU itself. The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority. *Adams v. Kinder-Morgan, Inc*., 340 F. 3d 1083, 1106-07 (10th Cir. 2003).

**2. Mr. McDuffie and HMCU obtained money by means of untrue statements of material fact in violation of Section 17(a)(2) of the Securities Act.**

Under Section 17(a)(2), the SEC must prove that the defendants directly or indirectly: (1) obtained money or property by means of an untrue statement of material fact or an omission to state a material fact; (2) with negligence; (3) in the offer or sale of securities; and (4) using any means of interstate commerce or of the mails. 15 U.S.C. § 77q(a)(2); *Smart*, 678 F.3d at 856-57. The Tenth Circuit has explained that Section 17(a) "requires substantially similar proof" as for a violation of Section 10(b) of the Exchange Act. *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008). In fact, the "principal difference" is that to establish a violation of Section 17(a)(2) the plaintiff need not establish scienter, only that the defendants acted negligently. *Id*. at 1256-57. The same evidence cited above supports the Defendants' liability for this claim. In sum, the Defendants obtained investor funds using material misrepresentations and omissions in the offer or sale of securities.

Given Mr. McDuffie's high level of scienter, summary judgment is particularly

appropriate here where only negligence is required.

### 3.  Mr. McDuffie and HMCU are also liable for scheme liability under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder, and Sections 17(a)(1) and (3) of the Securities Act.

The Defendants are also charged with scheme liability. Exchange Act Section 10(b)

and Rules 10b-5(a) and (c) make it unlawful to, in connection with the purchase of sale of

securities, "employ any device, scheme, or artifice to fraud" or "engage in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon

any person," with scienter. 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(a) and (c).

Securities Act Sections 17(a)(1) and (3) prohibit the same conduct in the offer or sale of

securities. 15 U.S.C. § 77q(a)(1) and (3). Courts have interpreted these provisions to

create what is known as "scheme liability."

To prove scheme liability, the SEC must prove that defendants directly or indirectly:

(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to

defraud; (3) with scienter. *SEC v. Lucent Tech.*, Inc., 610 F. Supp. 2d 342, 360 (D.N.J.

2009). To prove liability under Securities Act Section 17(a)(3), however, the SEC only

has to prove negligence rather than scienter. *Smart,* 678 F.3d at 857. For reasons stated

above, the Defendants are also liable under scheme liability. Specifically, the Defendants'

deceptive or manipulative acts included, among other things, presenting HMCU to the

public as a legitimate credit union regulated by the USVI government on its website and

in written materials and representing that the shares were insured when they were not.

These actions constitute a "device, scheme, or artifice to defraud" and Defendants

engaged in an "act, practice, or course of business which operated or would operate as a fraud or deceit upon any person." As such, the Defendants have admitted the conduct giving rise to their Exchange Act Section 10b-5(a) and (c) and Securities Act Section 17(a)(1) and (3) violations and summary judgment shall enter for the SEC.

## V. REMEDIES

The SEC seeks a permanent injunction against Mr. McDuffie and HMCU, disgorgement of the $532,591.97 and prejudgment interest thereon and third tier civil penalties.

### 1. Mr. McDuffie and HMCU shall be permanently enjoined.

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)(2)] provide that the SEC may seek a permanent injunction against future violations of the federal securities laws. For permanent injunctions against the Defendants, the SEC must demonstrate that a violation of the securities laws has occurred and that there is a reasonable probability of the defendants engaging in future violations if not enjoined. *See SEC v. Colonial Investment Mgmt.*, 381 Fed. Appx. 27, 31 (2d Cir. 2010); *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993); *SEC v. Pros Intern., Inc.,* 994 F. 2d 767, 769 (10th Cir. 1993); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Both elements are met here.

First, as demonstrated above by the undisputed facts, Mr. McDuffie and HMCU committed violations of the securities laws. The existence of past violations permits an inference that future violations will occur. *See SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996); *Gruenberg*, 989 F.2d at 978 (citing *SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir. 1982)); *Murphy*, 626 F.2d at 655. In assessing the likelihood of future violations, I

evaluate the "totality of the circumstances surrounding the defendant and his violations."
*Murphy*, 626 F.2d at 655. The following factors instruct my evaluation: the degree of scienter
exhibited; whether the violation was an isolated incident or systematic wrongdoing; whether the
defendant continues to maintain that his past conduct was not wrong; and whether by reason of a
defendant's profession he will be in a position where there are opportunities for future violations.
*See Colonial Investment Mgmt.*, 381 Fed. Appx. at 31; *Fehn*, 97 F.3d at 1295-96; *Murphy*,
626 F.2d at 655; *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998. Looking at these
factors, I note that Mr. McDuffie's scheme demonstrates a high degree of scienter, his
violations were not isolated given that he had previously operated a failed credit union in
the U.S. and subsequently moved to the Virgin Islands to continue his illegitimate credit
union operations, Mr. McDuffie has given no acknowledgement of his wrongful conduct
and there is no reason to conclude that he will not have opportunities to commit
violations in the future.  Accordingly, injunctions are warranted here against both Mr.
McDuffie and HMCU.

### 2. The SEC is entitled to disgorgement and prejudgment interest.

Disgorgement is designed to prevent the wrongdoer's unjust enrichment and to
deter violations of the securities laws. *United States v. Nacchio,* 573 F. 3d 1062, 1080
(10th Cir. 2009); *SEC v. United American Ventures, LLC.* 2012 U.S. Dist. LEXIS 51978
*15 (D.N.M. 2012). The court has broad discretion in awarding disgorgement because it
is an equitable remedy. *SEC v. Maxxon, Inc.* 465 F. 3d 1174, 1179 (10th Cir. 2006). The
SEC is entitled to disgorgement once it proves a reasonable approximation of the
defendants' ill-gotten gains. *SEC v. Curshen,* 372 Fed. Appx. 872, 883 (10th Cir. 2010).

Defendants have admitted that they took $532,591.97 from CD investors in HMCU. As such, the SEC is entitled to disgorgement of $532,591.97. This amount of disgorgement is proper both for violations of the registration provisions and the fraud violations because it constitutes the total amount raised from the sale of securities.

The SEC is entitled to prejudgment interest on the disgorgement "based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. §6621(a)(2); *SEC v. United American Ventures, LLC* at *22. Prejudgment interest on the $532,591.97 from January 2011, when HMCU shut down, is $51,382.57.

### 3. Third tier penalties are proper against Mr. McDuffie and HMCU.

Section 20(d)(1) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. §78u(d)(3)] authorize the SEC to seek a penalty against any person who has violated the securities laws. Third tier penalties may be assessed against individual defendants if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other person." *SEC v. United American Ventures, LLC,* at *23. I may award third tier penalties equal to the amount of "the gross amount of pecuniary gain" to each defendant as a result of the violation. 15 U.S.C. § 77t(d)(2)(C).

In reviewing the facts giving rise to a third tier penalty, I look at the circumstances and facts of the case. I consider (1) the egregiousness of the violations at issue; (2) the degree of the defendant's scienter; (3) whether the violations were isolated or recurrent; (4) defendants' failure to admit wrongdoing; (5) whether the defendants' conduct created

25

substantial losses or the risk of substantial losses to investors; (6) defendants' lack of cooperation and honesty with authorities; and (7) whether an otherwise appropriate penalty should be reduced due to the defendants' demonstrated current and future financial condition. *SEC v. United American Ventures, LLC* at *25 *citing, SEC v. Universal Express, Inc.* 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009). Upon review of these factors, for substantially the same reasons as set forth in the SEC's motion, I conclude that a third tier penalty against each of the Defendants is proper.  For both Mr. McDuffie and HMCU, I assess the "gross amount of pecuniary gain" or $532,591.97.

## VI. CONCLUSION

For the foregoing reasons, I GRANT the SEC's Motion for Summary Judgment, Doc. 26.


DATED:          September 15, 2014          BY THE COURT:

                                            *s/John L. Kane*
                                            John L. Kane, U.S. Senior District Judge